# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
June 20, 2011 Session

## TABITHA LAYNE, ET AL. v. TYRON LAYNE ADKINS, ET AL.

### Appeal from the Chancery Court for Jefferson County
### No. 08-061      Telford E. Forgety, Jr., Chancellor

### No. E2010-02189-COA-R3-CV-FILED-AUGUST 22, 2011

Tabitha Layne, individually, and as Administratrix of the Estate of Freddie Steven Layne, and as Next Friend of Stephanie Layne and Teddy Layne ("Plaintiff") sued Tyron Layne Adkins, Kenneth Rowe, and a certain tract or parcel of Property Identified as Map #089, Parcel 060.01 ("the Property") alleging, in part, that Ms. Adkins and Mr. Rowe had committed fraud with regard to deeds of conveyance of the Property. After a trial, the Trial Court entered its judgment finding and holding, *inter alia*, that four specific deeds with regard to the Property were void; that legal title to the Property is held by the heirs of Ted Layne with the Estate of Freddie Steven Layne holding title to one-third interest, Nancy Bolton Layne holding title to one-third interest, and Tyron Layne Adkins holding title to one-third interest; and awarding Mr. Rowe a judgment against Tyron Layne Adkins of $139,000 as a result of a cross-claim. Mr. Rowe appeals to this Court. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Melanie E. Davis, Maryville, Tennessee, for the appellant, Kenneth Rowe.

Agnes Trujillo, Jefferson City, Tennessee, for the appellee, Tabitha Layne.

C. Dwaine Evans, Morristown, Tennessee, for the appellee, Nancy Bolton Layne.

# OPINION

## Background

The Property at issue in this suit is located in Dandridge, Tennessee. Ted Layne ("Deceased") owned the Property at the time of his death in 2004. Deceased was a resident of Kentucky at the time of his death, and was survived by his two children, Freddie Steven Layne[1], and Tyron Layne Adkins. Deceased also was survived by Nancy Bolton Layne[2] to whom Deceased had been married and divorced twice. Specifically, Deceased and Ms. Bolton were married in 1983 and later divorced, and then remarried in 1998 and divorced in June of 2003. The June 2003 divorce was awarded by a Kentucky court. Deceased died in October of 2004. In 2007, the 2003 divorce decree between Deceased and Ms. Bolton was set aside and the Kentucky Court[3] declared that Ms. Bolton and Deceased were married at the time of Deceased's death.

Freddie Steven Layne died in August of 2005, approximately ten months after Deceased's death. Plaintiff, who married Freddie Steven Layne in 1996 and remained married to him until his death, survived Freddie Steven Layne's death. Plaintiff and Freddie Steven Layne had two children who survived Freddie Steven Layne's death. At the time of the trial, one of those children was 19 years old and the other still was a minor.

In 2004, Ms. Adkins was named the Administratrix of Deceased's Estate, which was administered through the Kentucky Court. During the pendency of this estate administration, Ms. Bolton and Plaintiff both filed actions alleging, in part, that Ms. Adkins was guilty of fraud and mismanagement as to Deceased's Estate, and seeking, in part, to have Ms. Adkins removed as Administratrix of Deceased's Estate.

The Kentucky Court entered an order on June 2, 2006 ordering Ms. Adkins "not to sell, convey, gift, transfer or otherwise dispose in whole or part, any of the assets or

---

[1]At times within this Opinion Freddie Steven Layne is referred to as Freddie Steve Layne or simply as Steven or Steve. In all quoted material within the Opinion we have left the name as it appears within the original. All of these versions refer to the same individual.

[2]Nancy Bolton Layne testified that the last name listed on her Social Security card and the name she uses is Bolton. We, therefore, will refer to Nancy Bolton Layne in this Opinion as Ms. Bolton.

[3]For purposes of simplicity only, we refer in this Opinion to each of the several Kentucky courts involved in this matter, i.e., Pike Circuit Court Division I, Pike Circuit Court Division II, and Pike District Court Probate Division, as the "Kentucky Court."

property of the Estate of Ted Layne." The Kentucky Court entered similar orders on June 13, 2006 and July 7, 2006. A Notice of Lis Pendens with regard to the Property was entered by the Kentucky Court on August 2, 2006. The Kentucky Court entered an order on August 18, 2006 removing Ms. Adkins as Administratrix of the Estate of Ted Layne. On March 27, 2009, the Kentucky Court entered a Settlement order regarding the distribution of assets of the Estate of Ted Layne, which states, in pertinent part:

10. The parties, Nancy Bolton Layne and Tabitha Layne, agree to jointly prosecute a separate hearing on damages against the former administratrix, Tyron Layne Adkins, as a result of her malfeasance and misappropriation of estate funds, which the parties hereto will stipulate that such judgment will exceed any distribution of property that the heir Tyron Layne Adkins may have been entitled hereto.

11. The parties, Nancy Bolton Layne and Tabitha Layne, shall be assigned equally any claims arising from the illegal transfer of certain property in Dandridge, Tennessee by Tyron Layne Adkins upon a finding by this Court that Tyron Layne Adkins had no authority from this or any other Court of competent jurisdiction as administratrix of the Estate of Ted Layne to sell, assign or otherwise transfer said real estate. This provision is not intended to impair the statutory share that either party is entitled to receive as a result of either Tennessee or Kentucky law, with the choice of law being determined by the Chancery Court of Jefferson County, Tennessee.

12. The parties, Nancy Bolton Layne and Tabitha Layne, shall be assigned equally any claim that the Estate of Ted Layne may have against Nancy Bolton Layne, Tyron Layne Adkins and the Estate of Freddie Steven Layne with Nancy Bolton Layne preserving any claim that she may have against the Estate of Freddie Steven Layne in her own right.

* * *

17. The parties hereto agree that the Estate of Ted Layne has become insolvent and the heirs hereto have received less than their full share as a result of the actions of Tyron Layne Adkins, including but not limited to the transfer of said Jefferson County Tennessee real estate.

Kenneth Rowe claimed that Ms. Adkins had sold him the Property. In April of 2008, Plaintiff filed the instant suit alleging, in part, that Ms. Adkins and Mr. Rowe had committed fraud with regard to deeds of conveyance of the Property. Ms. Bolton was

granted leave to intervene as an additional plaintiff[4] in the suit. This non-jury case was tried in April of 2010.

There are four deeds concerning the Property at issue in this suit. First, a Warranty Deed dated July 15, 2005 ("the July 15, 2005 Deed") from Freddie Steven Layne to Tyron Kay Adkins recorded in Jefferson County in January of 2007. Second, a General Warranty Deed dated July 20, 2006 ("July 20, 2006 Deed") from Tyron K. Adkins to Kenneth Rowe purporting to convey Ms. Adkins's half interest in the Property obtained by virtue of Deceased's death. The July 20, 2006 Deed was recorded in Jefferson County on July 25, 2006. Third, a Quit Claim Deed dated September 1, 2006 ("September 1, 2006 Deed") from Tyron K. Adkins to Kenneth Allen Rowe purporting to deed Ms. Adkins's half interest in the Property obtained from the Estate of Freddie Steven Layne. The September 1, 2006 Deed was recorded in Jefferson County in October of 2006. Fourth, a General Warranty Deed dated March 8, 2007 ("March 8, 2007 Deed") from Tyron K. Adkins to Kenneth Rowe purporting to convey the same property conveyed to Tyron K. Adkins from Freddie Steven Layne by July 15, 2005 Warranty Deed. The March 8, 2007 Deed also states Ms. Adkins intends to convey only her half interest in the Property. The March 8, 2007 Deed was recorded in Jefferson County in March of 2007.

In addition to the deeds, a copy of a handwritten agreement was entered as an exhibit at trial which reads:

> I Freddie Steven Layne give my share of [the Property] to Tyron Layne Adkins in return for $20,000.00 dollars, 2001 Chevy Duelly Pickup and car trailer, 1997 Toyotta [sic] Pickup Kingcab and Box trailer and a Maytag Washing Machine and Dryer and Drycleaning System and all the furnishings in the house at [the Property].

This document contains signatures purporting to be that of Freddie Steven Layne, Ms. Adkins, and Andy Adkins, and also contains a notary's signature and stamp.

Ms. Bolton testified at trial. She identified a real estate advertisement showing that the Property had been listed for sale at a price of $499,000. Ms. Bolton testified that this ad would have been circulated sometime after June of 2003. She testified that Ted Layne had told her around that time "that he was basically dissatisfied with staying in Tennessee and wanted to come back to Kentucky, so he put this house up and property up for sale."

---

[4]For purposes of simplicity only since there are a number of persons involved in this case who bear the last name 'Layne,' we refer in this Opinion to Tabitha Layne as "Plaintiff" and Nancy Bolton Layne as "Ms. Bolton," with the understanding that both are actual plaintiffs to this action.

Plaintiff also testified at trial. Plaintiff testified that she had not seen the July 15, 2005 Deed prior to her husband's death or during the year after his death. Plaintiff compared her husband's signature on their marriage license, a copy of which was admitted as an exhibit at trial, to the purported signature of her husband on the July 15, 2005 Deed and asserted that she was "almost one hundred percent positive" that the signature on the July 15, 2005 Deed was not her husband's signature. Plaintiff based this assertion both on the fact that the signature on her marriage license did not match the signature on the July 15, 2005 Deed and on the fact that "he was my husband and I know his handwriting." In addition, Plaintiff testified that Freddie Steven Layne had told her "numerous times" that he did not want to sell the Property.

Ms. Adkins testified that she sold the Property to Mr. Rowe for $150,000. When asked why she chose this price when Ted Layne had listed the Property previously for approximately half-a-million dollars, she stated there was a lot of damage to the house. When asked, however, Ms. Adkins could not recall when she last had seen the Property prior to agreeing to the price of $150,000. Ms. Adkins asserted that she went there while her brother was alive and also after he had died, and she stated that Jack Matthews was living at the Property at the time.

During her deposition taken in 2006, Ms. Adkins testified that her brother had leased the house to Jack Matthews and that she had signed the deeds to Mr. Rowe in an attempt to get Mr. Matthews out of the house. She stated that she had asked Mr. Matthews to vacate the premises, and he refused. She then went to court to remove Mr. Matthews. Ms. Adkins testified that the judge said that Mr. Matthews had to agree to get out. Ms. Adkins and Mr. Rowe had an attorney who represented both of them in attempting to evict Mr. Matthews. When asked why she and Mr. Rowe shared an attorney, Ms. Adkins stated: "I probably didn't know an attorney here." Ms. Adkins admitted that she had to pay a mechanic's lien to Mr. Matthews of $20,000 for repairs he had done to the Property. Ms. Adkins testified that the July 20, 2006 Deed she signed to Mr. Rowe was not a deed to transfer title but was prepared so that Mr. Rowe could help her evict Mr. Matthews. When asked at trial, Ms. Adkins admitted that her brother had leased the Property to Mr. Matthews.

When asked about the consideration she received from Mr. Rowe for the sale of the Property, Ms. Adkins was evasive in her answers until excerpts from her earlier video-taped testimony were played at trial. Ms. Adkins testified at one point that around July 20, 2006, Mr. Rowe loaned her $25,000 "paid in different amounts." She also testified: "I was never paid 150 at one time. It has been in different amounts." When asked if Mr Rowe had given her money since March of 2008, Ms. Adkins stated: "No." When asked if Mr. Rowe gave her money in 2007, Ms. Adkins stated she was "unsure." Ms. Adkins testified that she received smaller amounts from Mr. Rowe, but she kept referring to these amounts as loans.

-5-

When asked, Ms. Adkins testified she received $64,000 from Mr. Rowe in August of 2006.

The recording stamp on the July 15, 2005 Deed states that the actual consideration that Ms. Adkins paid Freddie Steven Layne for his interest in the Property was $80,000. Ms. Adkins was asked why she turned around and sold this interest to Mr. Rowe a year and a half later for $75,000. Ms. Adkins insisted that she sold the Property to Mr. Rowe for $150,000, but admitted that this was for both her half interest and her brother's half interest. She further admitted that the end result was that she sold her brother's interest for less than she bought it for.

When asked, Ms. Adkins agreed that the same person did not sign both the handwritten agreement between her and her brother for the sale of the Property, and the July 15, 2005 Deed. She asserted that her brother may have told someone else who was standing there at the time to sign his name to the handwritten document, but she was not sure that this actually happened.

Ms. Adkins was asked about the September 1, 2006 Deed, which states that it is conveying her half interest that she received from the Estate of Freddie Steven Layne. Ms. Adkins insisted that her brother signed the July 15, 2005 Deed to her and that she did not receive the Property by virtue of Plaintiff signing a deed as the Administratrix of Freddie Steven Layne's Estate. Ms. Adkins could not explain why the September 1, 2006 Deed contained that language. She stated: "I really didn't understand that part." Ms. Adkins claimed that she did not know why she signed the March 8, 2007 Deed.

Judy Casalino is Mr. Rowe's cousin as her grandmother and his grandmother were sisters. Mr. Rowe also is a neighbor to Ms. Casalino's parents. Ms. Casalino explained that she and Mr. Rowe also are related to Deceased whose mother was their grandmother's sister. Ms. Casalino testified that she and Mr. Rowe were friends. Plaintiff dates Ms. Casalino's son.

Ms. Casalino testified that she had conversations during the spring of 2006 with Mr. Rowe about the fact that Ms. Bolton was trying to overturn her divorce after the death of Ted Layne. Ms. Casalino and Mr. Rowe also talked about the Property. Mr. Rowe suggested that they purchase it, but Ms. Casalino felt that nothing could be done without a clear title and in the spring of 2006 it was not possible to obtain clear title. Ms. Casalino testified that she and Mr. Rowe had several such conversations.

Ms. Casalino visited the Property with Plaintiff in April or May of 2006. When asked to describe the Property, Ms. Casalino stated: "Oh, it's fabulous lakefront property, mountain view, lake view, lakefront…. It's a peninsula almost. I mean it's a lot of shoreline.

-6-

I have no idea how much." The Property has a dock and during the summer would have water on three sides. When asked what condition the Property was in when she visited it, Ms. Casalino stated:

> The house itself was in fairly good condition, I would say. It was just - - it was messy and had a lot of sleeping bags and cots and beds and that kind of thing. There was a hole in the upstairs bedroom ceiling. And there were some closet doors that were just off, but all you had to do was put them back on. But as far as major damage, I didn't see any major damage.

On July 2, 2006, Ms. Casalino and her family invited Mr. Rowe to spend time with them on the lake. They went out on a boat and rode by the Property. During the boat ride, Ms. Casalino's son made a comment about how he and Plaintiff would be getting the Property. After the boat ride Mr. Rowe said he was not feeling well and couldn't stay for dinner and left. Mr. Rowe had stated that he would join Ms. Casalino's family the next day, but he did not. Ms. Casalino attempted to contact Mr. Rowe, and he returned her phone call several days later and told her that he had business that had come up in Kentucky and he had to go home to Kentucky suddenly. Later that month, Mr. Rowe called Ms. Casalino and asked if she would offer Plaintiff $75,000 for her interest in the Property. Ms. Casalino declined to do this because she did not feel that was enough money for the Property.

Ms. Casalino also testified that on July 1, 2006 during a dinner, Plaintiff made a comment about how Ms. Adkins could not sell the Property because the Kentucky Court had ordered her not to sell anything. Ms. Casalino stated that Mr. Rowe was present when these statements were made.

Mr. Rowe testified at trial. He claimed that Ms. Casalino lied during her testimony. Mr. Rowe claimed that he knew nothing about Ted Layne's Estate prior to July 20, 2006. Later during his testimony, however, he testified that he had heard from Ms. Adkins's cousins that Ms. Adkins owned the Property.

Mr. Rowe testified that he gave Ms. Adkins $25,000 up front as good faith money on July 2nd, which he stated was not the same day that he took the boat ride with Ms. Casalino and her family. He stated that he gave Ms. Adkins this money on the day after the boat ride that Ms. Casalino testified about. Mr. Rowe testified that he and Deceased had "a deal going for $250,000" for the Property prior to Deceased's death. He testified that Ms. Adkins initially offered to sell him the Property for $350,000. Mr. Rowe stated that he offered Ms. Adkins $150,000 because of the condition of the house. He further testified: "I said I offered [Deceased] 250 for it and that's what I'll offer you. I come down here and looked at it and filmed the house. There wasn't a closet door in it. There was holes in the

ceiling, there was holes in the walls." The date on the video that Mr. Rowe took shows the film was taken on July 25, 2006.

Several times during his trial testimony, Mr. Rowe claimed to have been mistaken, i.e.,:

Q. In your deposition you told us that she wanted $350,000 and that you came back down here, shot a video that's dated July 25th, you went back up there, showed her the video, and she agreed to the $150,000.

A. I'm probably mistaken then, because I went in the house before that. I might be mistaken on that.

Q. So it's true you made a phone call to her and said I'll give you a [sic] $150,000 and she just immediately agreed to that?

A. No, no, no. I come in and we talked about it, because I told her I had been in the house earlier that spring and looked at it.

Q. So you lied to us in the deposition about showing her the video?

A. I didn't mean to lie. If I lied, I didn't mean to, okay. I'd be mistaken. I'd be mistaken.

At trial, Mr. Rowe was asked about his deposition testimony wherein when asked if he had ever pled guilty to a misdemeanor Mr. Rowe replied that he had not. Mr. Rowe later admitted to a 1990 misdemeanor theft of services charge that was dismissed and an allegation that he had threatened the judge in his son's murder trial. Mr. Rowe insisted that other than those incidents he never had been in court, but when questioned further he admitted: "No, that wouldn't be true then. I was wrong." Mr. Rowe also admitted that he had been charged, arrested, and convicted of criminal solicitation to commit wanton endangerment and criminal solicitation to commit arson. The victim was Mr. Rowe's ex-wife. The felony charge was dismissed and, in 2006, Mr. Rowe pled guilty to the misdemeanor. At trial, Mr. Rowe insisted: "Yes, I did have to plead guilty because my friend, Will T. Scott, told me to do it so I could get on with other things," but Mr. Rowe insisted that he was not guilty. Mr. Rowe also pled guilty to a felony for not paying one of his truck drivers.

Mr. Rowe insisted at trial that he did pay Ms. Adkins for the Property. Mr. Rowe insured the Property on July 19, 2006 for $420,000, but he claimed the property was

only worth $150,000. Mr. Rowe testified that he had spent more than $92,000 making repairs to the Property.

When asked about the September 1, 2006 Deed, Mr. Rowe stated:

I had seen the deed of Steve's and Tyron they throwed Tyron in jail for not appearing for a deposition or something. [sic] And here I was strung out, you know, got money out, she's in jail, she ain't go [sic] her deeds recorded down here. What am I supposed to do?

So when she got out of jail, you know, I told her we need to get a quit claim to get that deed recorded down here. Then the next thing I know she's back in jail again.

When asked why he went ahead and closed on the Property even though Ms. Adkins had failed to bring the July 15, 2005 Deed from her brother Mr. Rowe stated: "Well, I knowed I could trust her to get it down here." When asked if he spoke with Ms. Adkins after July 20, 2006 about the July 15, 2005 Deed from her brother, Mr. Rowe stated:

Yes. I told her she needed to get it down and she said well, I got to get out of jail first. So I said well, we'll get you out of jail, but we need to get something on record until you get down here and record that deed.

And Kent Varney agreed to do a Quit Claim Deed to secure, you know, to secure Steve's part until she got down here to get it recorded.

Mr. Rowe and Ms. Adkins signed a Mechanics' Lien and Extended Coverage Affidavit and Indemnity form ("Affidavit") for Stewart Title Guaranty Company on July 20, 2006 declaring under oath, in part, that the only occupants of the Property were the undersigned or the purchasers, that there were no unrecorded contracts, deeds, or leases affecting the Property, and that if an estate were involved a diligent effort had been made to ascertain all of decedent's known creditors. When asked about the fact that Mr. Matthews was living on the Property at the time the Affidavit was signed, Mr Rowe replied: "On the day it was signed there probably wasn't anybody over there." When questioned further about the Affidavit, Mr. Rowe stated: "I didn't read this document…. Well, I made a mistake…. It's my stupidity." When asked if he committed perjury by signing the Affidavit Mr. Rowe replied: "Well, I hope I didn't. I hope it was an honest mistake." When asked if he had made an effort to ascertain decedent's creditors, Mr. Rowe replied: "No, I didn't do that. It could be an honest mistake or perjury, if you want to call it, whatever." When asked, Mr. Rowe stated he did not have anyone in Jefferson County check the title when he took the September

1, 2006 Deed, nor did he have a lawyer in Kentucky check the Ted Layne probate file or the Freddie Steven Layne probate file.

Jack Matthews testified that he leased the Property from Freddie Steven Layne approximately a month before Freddie Steven Layne died, although he was unsure of the exact date. Mr. Matthews had a lease-purchase agreement with Freddie Steven Layne for a purchase price of $234,800. Mr. Matthews paid rent for the first month plus a damage deposit to Freddie Steven Layne, and later when Freddie Steven Layne contacted him, Mr. Matthews paid a portion of the next month's rent also. After Freddie Steven Layne died, Mr. Matthews paid rent to Freddie Steven Layne's girlfriend, Pam. Mr. Matthews also spoke with Ms. Adkins a day or two prior to leasing the Property from Freddie Steven Layne and told her that he was about to sign a lease. Ms. Adkins never told Mr. Matthews he could not rent from Freddie Steven Layne because she owned the Property.

Roosevelt Coleman worked for Deceased running a junkyard and then working in a garage. He testified that he saw Freddie Steven Layne and Ms. Adkins signing a deed during the summer of 2005. Mr. Coleman stated that he actually saw Freddie Steven Layne sign the deed, and that he also actually saw Ms. Adkins sign the deed. Mr. Coleman testified that the document he saw them sign was handwritten. When asked further about the document he saw being signed, Mr. Coleman stated: "I know it was a deed."

Billy Ratliff testified that he knows Ms. Adkins because he did business with Deceased. Mr. Ratliff worked for Freddie Steven Layne. Mr. Ratliff testified that he overheard a conversation between Ms. Adkins and Freddie Steven Layne saying that Ms. Adkins was buying the Property from Freddie Steven Layne. Mr. Ratliff saw Ms. Adkins and Freddie Steven Layne signing documents, and when asked what documents, Mr. Ratliff stated: "It was the property in Tennessee to the best of my knowledge.… It was a deed, yeah." Mr. Ratliff also stated that he saw both Freddie Steven Layne and Ms. Adkins sign the document.

The Trial Court entered its judgment on June 11, 2010. In its detailed findings of fact and conclusions of law incorporated into the judgment by reference, the Trial Court specifically found and held, *inter alia*:

First of all, let me back up a second. The motion that Ms. Layne filed to vacate the Kentucky divorce decree between her and Ted Layne the motion was filed April 20th, 2005. Not coincidently in the Court's opinion the purported handwritten agreement between Freddie Steven Layne and Tyron Layne Adkins is dated June 2005. Just about a month-and-a-half after the motion to set that divorce decree aside. Is that coincidental? I don't think so.

-10-

And then we have a deed, what purports to be a deed, dated July 15, 2005, which purports to be signed by Freddie Layne. And the Court notes that there is explained that deed is a forgery and as I already told you I think it is a forgery. There is a marriage license here between Freddie Steven Layne and Tabitha Belcher Layne and there is no question but that the marriage license has the true and correct signatures of both parties.

And looking at the two signatures, there are in the Court's opinion significant difference [sic] between the two. I note that the signature on the deed is what appears to be a fair attempt, a fair attempt to reproduce the signature of Freddie Steven Layne and that's exactly what I think it is. It's in my opinion an attempt to reproduce the signature of Freddie Steven Layne. And there are other reasons I think that as well.

This thing about Jack Matthews that we talked about earlier. Jack Matthews leased this property from Freddie Steven Layne at least sometime in July, the Court finds, at least sometime in July of 2005.

Now, the argument could be made now look, Judge, the deed from Steve to Tyron is dated July 15th, whether or not Jack Matthews leased it before July 15th. Well, if he leased it from Freddie Steven Layne before July 15th, one would assume that there would have been some reason that Freddie Steven Layne would have said, well, now, wait a minute, you'll have to go see my sister Tyron because the purported agreement, purported agreement, handwritten agreement, between Freddie and Tyron remember was dated June 7th, June 7th.

\* \* \*

I might say this about credibility. I've listened and I've watched the witnesses and I cannot accredit and do not accredit the testimony of Tyron Adkins and Kenneth Rowe. I do not accredit it.

\* \* \*

Anyway, other reasons that I believe this is a forgery, like I say, I heard Tyron's testimony about Steven signing the deed and I cannot accredit that and don't accredit it.

The testimony of witnesses that they called on their behalf, Mr.

-11-

Coleman and Mr. Coleman's grandson, Billy Ratliff, and who else was it, just the two that testified. And the point is well taken by counsel for the plaintiff, Mr. Evans, they both testified I saw Tyron sign and I saw Steven sign.

And the warranty deed couldn't have been the deed because the warranty deed is signed by Steven, not by Tyron. And Tyron, moreover, Tyron herself says look, if you look at that handwritten agreement dated June 7th, if you look at the signature on it and the signature on the warranty deed, it's obvious that the same person didn't sign both of them. I agree, it's obvious that it's not the same person.

So all things considered the Court must find and does find that deed was a forgery and, accordingly, Freddie Steven Layne's interest in the property was never conveyed away from him to Tyron and, consequently, Tyron never owned it to convey it away to Mr. Rowe so Mr. Rowe didn't get it.

* * *

Once again I touched on this a little bit earlier, it is clear to me when I put two and two together and judging the credibility of the witnesses here and some other factors. By the way, the Court notes that the deed, going to back up and talk about the deed, the purported deed from Steve, it wasn't recorded for a year-and-a-half. And that to the Court is a badge of fraud in this case. The deed wasn't recorded for a year-and-a-half. Why?

By the way, these matters raised about failure of consideration both are party to a deed and this third party to a deed and nonparty to a deed doesn't have the right to raise failure [of] consideration anyway, generally speaking.

But I do think the matter of the claimed consideration here is another badge of fraud, because, quite frankly, it's clear to me that this property was worth a lot more money than it was purportedly transferred from Tyron Adkins to Kenneth Rowe, of course that is a problem.

One other thing because the Court raised eyebrows when Ms. Adkins went back and forth about several things about whether the deed, the first deed, to Mr. Rowe is really intended to transfer the property or was it just meant to get Mr. Rowe in a position so he could get Mr. Matthews out of the house and get the lease terminated. And the lease was terminated, by the way, some payments made for a mechanic[']s liens [sic] claim and some other

-12-

things and some payments made by Kenneth Rowe. So all of those things put together, those are just adding to the problem.

Now, as to the matter of Nancy Bolton and her claim, like I said earlier, I alluded to this earlier, I must and do conclude that Mr. Rowe was aware of what was going on in this estate.

There was a community and Nancy Casalino [sic] had testified that she had in fact talked to him about it before these deeds were made to him, the first of these deeds, and I, quiet [sic] frankly, believe she did. So I cannot conclude that Mr. Rowe was a bonafide purchaser of the value to an innocent third party in Kentucky - - Nancy Bolton and Freddie Steven Layne's heirs.

Accordingly, the Court will set aside this purported deed from Freddie Steven Layne to Tyron Adkins dated July 15, 2005. The Court will likewise set aside the deeds from Tyron Layne [Adkins] to Kenneth Rowe, the quit claim deed from Tyron Adkins dated September 1st, 2006, the warranty deed dated July 20th, 2006 and the warranty deed dated March 8th, 2007.

The Trial Court held, *inter alia*, that legal title to the Property:

is held by the Heirs of Ted Layne, specifically such that The Estate of Freddie Steven Layne holds legal title to a One Third (1/3) interest in the same as surviving child, Nancy Bolton Layne holds legal title to a One Third (1/3) interest in the same as surviving spouse and Tyron Layne Adkins holds legal title to a One Third (1/3) interest in the same as surviving child.

Mr. Rowe filed a motion for new trial or to alter or amend, which the Trial Court denied. Mr. Rowe appeals to this Court.

### **Discussion**

Although not stated exactly as such, Mr. Rowe raises five issues on appeal: 1) whether the Trial Court erred in denying a new trial based on allegations of mistakes and errors made by trial counsel; 2) whether the Trial Court erred in giving full faith and credit to the Kentucky judgment setting aside the divorce between Deceased and Ms. Bolton; 3) whether the Trial Court erred in holding that the July 15, 2005 Deed was forged and was null and void; 4) whether the Trial Court erred in holding that Mr. Rowe did not have an interest in the property through deeds from Ms. Adkins; and, 5) whether the Trial Court erred in

-13-

holding that Mr. Rowe was not a bona fide purchaser for value.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first consider whether the Trial Court erred in denying a new trial based on allegations of mistakes and errors made by Mr. Rowe's trial counsel.[5] Mr. Rowe argues in his brief on appeal that the trial "apparently lasted until approximately 8:30 p.m. This late hour caused prejudice to Kenneth Rowe in that it caused his prior counsel Ms. Smith to be unduly tired and fatigued and thus to make critical mistakes in not calling witnesses or introducing proof." (citation omitted).

In the transcript incorporated into the Trial Court's order denying the motion for new trial or to alter or amend the judgment, the Trial Court specifically stated with regard to this issue:

> By the way, I make this observation as well on the matter of the late hour there was no objection raised and I agree quite frankly with Mr. Evans on that point. We didn't try this thing particularly late. It may have been 8:30 when we got out of here but as far as the calling of witnesses and so forth I mean we weren't ten o'clock at night or eleven o'clock or midnight. I remember it. It was later than I like to go and later than they liked to or wanted to go or would have liked to go.
>
> But nobody objected and nobody said, "Look Judge I'm worn out. I'm tired. I can't think straight." As for example Mr. Gaylon did in the Hembrey case as Counsel ought to do. I mean, if you've got something I mean bring it to the Court's attention otherwise how am I going to know about it. And didn't bring it to my attention.
>
> Once again, even if she had of [sic] called other witnesses if she was tired it was harmless there because quite frankly as I said before I concluded that I could not accredit Ms. Layne nor Mr. Rowe and it wouldn't have made any difference at that point in time who had been called.

---

[5]Mr. Rowe is represented on appeal by a different attorney.

Mr. Rowe supports his assertion that his attorney was "unduly tired and fatigued" with only his own self-serving affidavit filed with his motion for new trial wherein he asserts: "When I asked [my trial counsel] why she did not call [the other two witnesses] she indicated that she got tired due to the late hour and forgot." Mr. Rowe points to nothing else in the record on appeal that supports Mr. Rowe's assertion that his trial counsel was "unduly tired and fatigued," and, as the Trial Court noted, this alleged fatigue never was brought to the Trial Court's attention.

Mr. Rowe is unhappy with the way in which his trial counsel presented, or chose not to present, certain items of proof. Unfortunately for Mr. Rowe, this is insufficient to justify granting a new trial. Furthermore, we note that the Trial Court stated, and we agree, that failure to present further evidence was harmless as the Trial Court found both Ms. Adkins and Mr. Rowe to be not credible. This issue is without merit.

We next consider whether the Trial Court erred in giving full faith and credit to the Kentucky judgment setting aside the divorce between Deceased and Ms. Bolton. The Kentucky order which set aside the divorce was admitted as a stipulated exhibit at trial without objection.

A careful and thorough review of the record on appeal reveals that the issue of whether the Trial Court should award full faith and credit to the Kentucky judgment was not tried. This issue was raised for the first time in Mr. Rowe's motion for new trial or to alter or amend the judgment. In fact, Mr. Rowe's appellate counsel admitted during the hearing on the motion for new trial or to alter or amend the judgment that the issue of fraud in connection with the Kentucky judgment, which would serve as grounds for not allowing full faith and credit, was not proven at trial, and that Mr. Rowe's prior counsel had accepted the Kentucky judgment at trial.

As the issue of whether the Kentucky judgment should be afforded full faith and credit was not raised at trial, it was waived. Furthermore, we note that even if the Kentucky judgment were not afforded full faith and credit, and Ms. Bolton were found to have no interest in the Property, such a finding would have no effect whatsoever upon the Trial Court's determination that Mr. Rowe has no interest in the Property, as will be discussed more fully below. Thus, Mr. Rowe would gain no benefit whatsoever from such a finding. This issue is without merit.

Next, we consider whether the Trial Court erred in holding that the July 15, 2005 Deed was forged and was null and void. With regard to this issue, the Trial Court specifically found and held:

The motion that [Ms. Bolton] filed to vacate the Kentucky divorce decree between her and Ted Layne the motion [sic] was filed April 20th, 2005. Not coincidently in the Court's opinion the purported handwritten agreement between Freddie Steven Layne and Tyron Layne Adkins is dated June 2005. Just about a month-and-a-half after the motion to set that divorce decree aside. Is that coincidental? I don't think so.

And then we have a deed, what purports to be a deed, dated July 15, 2005, which purports to be signed by Freddie Layne. And the Court notes that there is explained that deed is a forgery and as I already told you I think it is a forgery. There is a marriage license here between Freddie Steven Layne and [Plaintiff] and there is no question but that the marriage license has the true and correct signatures of both parties.

And looking at the two signatures, there are in the Court's opinion significant difference [sic] between the two. I note that the signature on the deed is what appears to be a fair attempt, a fair attempt to reproduce the signature of Freddie Steven Layne and that's exactly what I think it is. It's in my opinion an attempt to reproduce the signature of Freddie Steven Layne. And there are other reasons I think that as well.

This thing about Jack Matthews that we talked about earlier. Jack Matthews leased this property from Freddie Steven Layne at least sometime in July, the Court finds, at least sometime in July of 2005.

Now, the argument could be made now look, Judge, the deed from Steve to Tyron is dated July 15th, whether or not Jack Matthews leased it before July 15th. Well, if he leased it from Freddie Steven Layne before July 15th, one would assume that there would have been some reason that Freddie Steven Layne would have said, well, now, wait a minute, you'll have to go see my sister Tyron because the purported agreement, purported agreement, handwritten agreement, between Freddie and Tyron remember was dated June 7th, June 7th.

\* \* \*

Anyway, other reasons that I believe this is a forgery, like I say, I heard Tyron's testimony about Steven signing the deed and I cannot accredit that and don't accredit it.

-16-

The testimony of witnesses that they called on their behalf, Mr. Coleman and Mr. Coleman's grandson, Billy Ratliff, and who else was it, just the two that testified. And the point is well taken by counsel for the plaintiff, Mr. Evans, they both testified I saw Tyron sign and I saw Steven sign.

And the warranty deed couldn't have been the deed because the warranty deed is signed by Steven, not by Tyron. And Tyron, moreover, Tyron herself says look, if you look at that handwritten agreement dated June 7th, if you look at the signature on it and the signature on the warranty deed, it's obvious that the same person didn't sign both of them. I agree, it's obvious that it's not the same person.

So all things considered the Court must find and does find that deed was a forgery and, accordingly, Freddie Steven Layne's interest in the property was never conveyed away from him to Tyron and, consequently, Tyron never owned it to convey it away to Mr. Rowe so Mr. Rowe didn't get it.

* * *

By the way, the Court notes that the deed, going to back up and talk about the deed, the purported deed from Steve, it wasn't recorded for a year-and-a-half. And that to the Court is a badge of fraud in this case. The deed wasn't recorded for a year-and-a-half. Why?

Mr. Rowe argues on appeal that there is "insufficient proof for the court to declare null and void the deed from Freddie Steven Layne to Tyron Layne Adkins dated July 15, 2005." We disagree, as did the Trial Court. Mr. Rowe asserts that the proof that the July 15, 2005 Deed was forged came mainly from the deposition testimony and affidavit of Nathan Tyler Williams. Again, we disagree, as did the Trial Court. The Trial Court did not base its findings relative to this issue upon the deposition and affidavit of Mr. Williams. A careful and thorough review of the record on appeal reveals a great deal of other evidence that supports the Trial Court's findings, all as set out in detail in the Trial Court's findings of fact, wholly separate and apart from the deposition and affidavit of Mr. Williams.

Contrary to Mr. Rowe's assertion in his brief on appeal, the trial testimony of Mr. Coleman and Mr. Ratliff do not support Mr. Rowe's position. Rather, it is clear from the testimony given by these two witnesses that they did not witness Freddie Steven Layne signing the July 15, 2005 Deed. This is particularly clear because each of these witnesses testified that he saw both Freddie Steven Layne and Ms. Adkins signing the document, and Ms. Adkins never signed the July 15, 2005 Deed.

-17-

Furthermore, the Trial Court made very specific findings with regard to credibility in this case. In its findings of fact, the Trial Court stated: "I might say this about credibility. I've listened and I've watched the witnesses and I cannot accredit and do not accredit the testimony of Tyron Adkins and Kenneth Rowe. I do not accredit it."

As our Supreme Court has instructed:

When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011).

The Trial Court had the opportunity to observe the witnesses, assess their demeanor, and evaluate their credibility, and the Trial Court specifically found Ms. Adkins and Mr. Rowe to be not credible. We give great deference to the Trial Court's credibility determinations, and we find nothing in the record that even begins to approach being clear and convincing evidence to the contrary.

The evidence in the record does not preponderate against the Trial Court's findings that the July 15, 2005 Deed was forged and was null and void. We, therefore, affirm the Trial Court's holding that the July 15, 2005 Deed is set aside and deemed void.

We next consider whether the Trial Court erred in holding that Mr. Rowe had no interest in the Property through the deeds from Ms. Adkins. In addition to its other findings as discussed above, with regard to this issue, the Trial Court found and held:

But I do think the matter of the claimed consideration here is another badge of fraud, because, quite frankly, it's clear to me that this property was worth a lot more money than it was purportedly transferred from Tyron Adkins to Kenneth Rowe, of course that is a problem.

One other thing because the Court raised eyebrows when Ms. Adkins

went back and forth about several things about whether the deed, the first deed, to Mr. Rowe is really intended to transfer the property or was it just meant to get Mr. Rowe in a position so he could get Mr. Matthews out of the house and get the lease terminated. And the lease was terminated, by the way, some payments made for a mechanic[’]s liens [sic] claim and some other things and some payments made by Kenneth Rowe. So all of those things put together, those are just adding to the problem.

During the hearing on the motion for new trial or to alter or amend the Trial Court stated:

Let me just tell you, I thought at the time and I think today I didn’t believe Tyron Layne [Adkins], I didn’t believe Kenneth Rowe then and I don’t now.

I thought this thing was shot through and through and through with fraud about as bad as anything that I’ve ever seen in all the years that I’ve practiced Law in my opinion. We’ll see what the Court of Appeals says. But it’s about as bad and about as straight forward and about as clearly proven a case of fraud in the … and I concluded then and I conclude now, Tyron Layne [Adkins] was on the hot-seat for money she had mismanaged and let get away and/or out and out taken herself out of the Estate of Ted Layne. And this deal was cooked up to try to Deed the property off to Mr. Rowe and put it beyond the reach of the other heirs to the Estate. And I thought so then. I think so now.

As pertinent to this issue, Tenn. Code Ann. § 66-3-101 provides:

**66-3-101. Conveyances in fraud of creditors or purchasers void. –** Every gift, grant, conveyance of lands, tenements, hereditaments, goods, or chattels, or of any rent, common or profit out of the same, by writing or otherwise; and every bond, suit, judgment, or execution, had or made and contrived, of malice, fraud, covin, collusion, or guile, to the intent or purpose to delay, hinder, or defraud creditors of their just and lawful actions, suits, debts, accounts, damages, penalties, forfeitures; or to defraud or to deceive those who shall purchase the same lands, tenements, or hereditaments, or any rent, profit, or commodity out of them, shall be deemed and taken, only as against the person, such person’s heirs, successors, executors, administrators, and assigns, whose debts, suits, demands, estates, or interest, by such guileful and covinous practices, shall or might be in any wise disturbed, hindered,

delayed, or defrauded, to be clearly and utterly void; any pretense, color, feigned consideration, expressing of use, of any other matter or thing, to the contrary notwithstanding.

Tenn. Code Ann. § 66-3-101 (2004). In pertinent part, Tenn. Code Ann. § 66-3-305 provides:

**66-3-305. Transfers fraudulent as to present and future creditors. –**

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor; ....

Tenn. Code Ann. § 66-3-305 (2004). The term 'creditor' is defined in Tenn. Code Ann. § 66-3-302 as "a person who has a claim." Tenn. Code Ann. § 66-3-302(4) (2004).

As this Court explained in *Macon Bank and Trust Co. v. Holland*:

Whether a transfer is fraudulent is determined by the facts and circumstances of each case. Gibson's *Suits in Chancery* (5th Ed. 1955) § 1057, p. 328, states: "Inasmuch as frauds are generally secret, and have to be tracked by the footprints, marks, and signs made by the perpetrators, and discovered by the light of the attending facts and circumstances, these evidences are termed 'badges of fraud.'" (A more colorful description of these "badges" is found in *Floyd v. Goodwin*, 16 Tenn. 484: "[Fraud] therefore has to be ferreted out by carefully following its marks and signs; for fraud will, in most instances, though never so artfully and secretly contrived, like the snail in its passage, leave its slime by which it may be traced.") A "badge of fraud" is any fact that throws suspicion on the transaction and calls for an explanation. Where the circumstances of a transfer of property by a debtor are suspicious, the failure of the parties to testify or to produce available explanation or rebutting evidence is a badge of fraud. *Union Bank v. Chaffin*, 24 Tenn App. 528, 147 S.W.2d 414 (1940).

*Macon Bank and Trust Co. v. Holland*, 715 S.W.2d 347, 349 (Tenn. Ct. App. 1986).

The Kentucky Court found and held that Ms. Adkins was guilty of "malfeasance and misappropriation of estate funds" in the Estate of Ted Layne. The Kentucky Court further found and held that the "Estate of Ted Layne has become insolvent and the heirs hereto have received less than their full share as a result of the actions of Tyron Layne Adkins…," and stated that Plaintiff and Ms. Bolton had agreed to jointly prosecute a separate hearing on damages against Ms. Adkins. Thus, Plaintiff and Ms. Bolton who have claims against Ms. Adkins qualify as creditors of Ms. Adkins for purposes of the relevant statutes.

The Trial Court in the instant case found several badges of fraud. The evidence in the record on appeal does not preponderate against these findings. The Trial Court clearly found that the deeds from Ms. Adkins to Mr. Rowe were made in an attempt to defraud the heirs to the Estate of Ted Layne, and the Estate of Freddie Steven Layne, which includes Plaintiff and Ms. Bolton. Again, the evidence in the record on appeal, as discussed more fully above, does not preponderate against these findings.

Mr. Rowe argues on appeal that he should be considered a bona fide purchaser, which would protect him from the findings pursuant to the statutes as discussed above. This brings us to the final issue we must consider, whether the Trial Court erred in holding that Mr. Rowe was not a bona fide purchaser for value.

As this Court stated in *Estate of Darnell v. Fenn*:

> This court has recently defined "bona fide purchaser" as "one who buys something for value without notice of another's claim to the item or of any defects in the seller's title; one who has in good faith paid valuable consideration for property without notice of prior adverse claims." *Rogers v. The First Nat'l Bank*, C/A No. M2004-02414-COA-R3-CV, 2006 WL 344759 at *12 (Tenn. Ct. App. M.S., Feb. 14, 2006)(emphasis added); *accord Henderson v. Lawrence*, 212 Tenn. 247, 369 S.W.2d 553, 556 (1963)(stating "A bona fide purchaser is one who buys for a valuable consideration without knowledge or notice of facts material to the title").

*Estate of Darnell v. Fenn*, 303 S.W.3d 269, 279 (Tenn. Ct. App. 2009) (quoting *Aslinger v. Price*, No. E2006-00029-COA-R3-CV, 2006 Tenn. App. LEXIS 584, 2006 WL 2521566 (Tenn. Ct. App. Sept. 1, 2006), *perm. app. denied* Jan. 29, 2007).

With respect to this issue, the Trial Court specifically found and held:

Now, as to the matter of Nancy Bolton and her claim, like I said earlier,

-21-

I alluded to this earlier, I must and do conclude that Mr. Rowe was aware of what was going on in this estate.

There was a community and Nancy Casalino [sic] had testified that she had in fact talked to him about it before these deeds were made to him, the first of these deeds, and I, quiet [sic] frankly, believe she did. So I cannot conclude that Mr. Rowe was a bonafide purchaser of the value to an innocent third party in Kentucky - - Nancy Bolton and Freddie Steven Layne's heirs.

The Trial Court found Mr. Rowe to be not credible and also found Ms. Casalino to be credible. We give great deference to the Trial Court's findings with regard to credibility. The evidence, as discussed more fully above, does not preponderate against the Trial Court's finding that Mr. Rowe was not a bona fide purchaser for value without notice.

We affirm the Trial Court's June 11, 2010 judgment.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Kenneth Rowe, and his surety.

_____
D. MICHAEL SWINEY, JUDGE